UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SOLIDARITY LIMITED,<br><br>Plaintiff,<br><br>v.<br><br>JEFFEX, LLC, ET AL.,<br><br>Defendants. | No. 20 CV 1456<br><br>Magistrate Judge McShain |

### MEMORANDUM OPINION AND ORDER

Pending before the Court is plaintiff Solidarity Limited's motion for summary judgment. [93].[1] The motion is fully briefed. [96, 100]. For the following reasons, the motion is granted in part and denied in part as moot.

### Background

This case arises out of a failed loan agreement between Solidarity and defendants JeffEx, LLC, Jeffrey Cioni, James Cioni, and David Brittsan. The principal dispute on summary judgment is whether the Cionis and Brittsan agreed to be personally liable for repaying the money that Solidarity loaned to JeffEx.

Brittsan and the Cionis were partners in a separate company called Rescue Tire Recycling (RTR). [96-2] 2, at ¶¶ 3-4. In mid- to late 2015, Brittsan and the Cionis began soliciting capital to fund RTR's operations, including the purchase of real estate, a building to use as RTR's plant and headquarters, and a fleet of trucks. [93-1] 2, at ¶ 8; [96-5] 3, at ¶ 4 (affidavit of David Brittsan). Brittsan and the Cionis engaged a venture capital firm, Venture DNA, to help RTR raise up to $20 million in cash. [96-2] 3, at ¶ 6. According to the Cionis and Brittsan, Venture DNA significantly misrepresented its ability to raise $16 million through the issuance of industrial revenue bonds, which delayed RTR's receipt of needed funds. [*Id*.]. RTR therefore sought to obtain a bridge loan to fund its operations in the short term, pending resolution of the bond issue. [96-2] 2-3, ¶¶ 7-8.

---

[1] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings.

In either September or December 2015, Brittsan met with Solidarity's agent TJ Weber and a broker named Jay Johnson to discuss Solidarity making a $175,000 bridge loan to JeffEx, an excavating contractor business that was owned and operated by Jeffrey Cioni. [96-2] 4; *see also* [93-12] 5, at 9:2-9 (deposition of Jeffrey Cioni). In exchange for the loan, JeffEx would pledge four pieces of equipment–two excavators and two loaders, which JeffEx valued at over $400,000–as collateral. [96-2] 3-4, at ¶ 8. According to the defendants, once RTR's bond issues with Venture DNA had been resolved, RTR would purchase this equipment from JeffEx, and JeffEx would use the sale proceeds to repay Solidarity. [*Id.*].

The specifics of the negotiations between Brittsan and Weber are disputed. According to Brittsan, he advised Weber that "the security for the loan was only the [e]quipment, and not RTR Partners' personal assets." [96-5] 4, at ¶ 9. For his part, Weber stated that Solidarity wanted Brittsan and the Cionis to personally guarantee the loan, and that Brittsan represented that he and the Cionis would do so. [100-1] 2, at ¶¶ 8, 13-14.[2]

On December 28, 2015–after the meeting between Brittsan, Weber, and Johnson–JeffEx, the Cionis, and Brittsan executed a Commercial Note (the Note), a promissory note that is at the heart of the parties' dispute. *See* [96-6] 2-5 (Commercial Note dated Dec. 28, 2015). The first paragraph of the Note provided that:

> The Undersigned (whose principal place of business is listed below), jointly and severally, if more than one, for value received, promise to pay to the order of Solidarity Limited, Miramar Tower, Unit 1010, 132 Nathan Road, SimShaTsui, Kowloon HONG KONG (hereafter, together with any holder hereof, called "Lender"), at the main office of Lender, the principal sum of $175,000.
>
> > On or before 90 days from receiving the Principal Sum ("Maturity Date").
> >
> > In addition to payment of the principal sum to Lender as provided for above, the Undersigned promises and agrees to pay Lender $50,000 in interest on or before the Maturity Date.

---

[2] Weber made this statement in a declaration that was attached to Solidarity's reply in support of its summary-judgment motion. "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the [non-movant] an opportunity to respond." *Physicians Healthsource, Inc. v. A-S Med. Solutions, LLC*, 950 F.3d 959, 969 (7th Cir. 2020) (internal quotation marks omitted and internal brackets added). Here, the Court refers to Weber's reply declaration only to provide background for the parties' dispute, and the Court's determination that Solidarity is entitled to summary judgment does not depend on this declaration in any way.

2

[*Id.*] 2.

The "Defaults and Remedies" section of the Note further provided that:

[f]ailure of the Undersigned to pay any amount due hereunder for a period in excess of ten days after it becomes due and payable under this Note . . . shall constitute an event of default (Default) hereunder. At any time during the existence of any Default, and at the option of Lender, the entire unpaid principal balance under this Note, together with interest accrued thereon and all other sums due from the Undersigned hereunder or under the Mortgage or any of the other security agreements or documents (collectively, Loan Documents), shall without notice become immediately due and payable.

[96-6] 3.

The "Other Matters" section of the note included additional language reiterating that "[t]he Undersigned" would be jointly and severally liable for repaying Solidarity:

The Undersigned and each guarantor hereof, if any, and any and all others who now or may become liable for all or part of the obligations of the Undersigned under this Note (all of the foregoing being referred to collectively herein as "Obligors") agree to be jointly and severally bound hereby[.]

\* \* \*

The Undersigned, if more than one, agree that they are jointly, severally, and primarily liable for repayment of this Note[.]

[96-6] 3-4

Finally, the Note explained that "[t]he Undersigned have caused this Note to be executed as of the date first written above. Signature page follows." [96-6] 4. The signature page, which immediately follows this language, contains four signatures: Jeffrey Cioni signed the Note on behalf of JeffEx, and–under the header "Individuals"–the Cionis and Brittan signed the Note on their own behalf. [*Id.*] 5. The signature page also identifies each signing party's address: JeffEx's address in Gurnee, Illinois; James Cioni's address in Highwood, Illinois; Jeffrey Cioni's address in Lake Forest, Illinois; and Brittsan's address in Glenview, Illinois. [*Id.*].

Solidarity and JeffEx also executed a security agreement. *See* [93-7] 2-10 (Security Agreement dated Dec. 28, 2015). The security agreement granted Solidarity

3

a security interest in four pieces of JeffEx's equipment–the excavators and loaders mentioned above–and authorized Solidarity to file a financing statement that described this collateral and any statutory liens that Solidarity held. [*Id.*] 3.

Solidarity distributed $110,000 to JeffEx on December 30, 2015, and the remaining $65,000 was distributed to JeffEx on January 7, 2016. [93-3] 3, at ¶ 8 (declaration of TJ Weber). Under the Note's ninety-day repayment provision, the Note matured and came due on April 6, 2016. [96-6] 1. It is undisputed that JeffEx did not repay the loan or pay the interest owed under the Note by April 6, 2016. [93-3] 3, at ¶ 9; [93-10] 22, at 77:15-18 (deposition of James Cioni).

On April 18, 2016, the parties entered into a Loan Modification Agreement "for the purpose of changing the Maturity Date of the Note." [93-8] 2 (Loan Modification Agreement dated Apr. 18, 2016) (Modification Agreement). The Modification Agreement provided that "[t]he parties agreed to amend and restate all pages of the Note in its entirety," except that "[t]he New Maturity Date of the Note shall be May 15, 2016." [*Id.*]. The parties also agreed that JeffEx would pay Solidarity a late charge of $8,750, making the total amount due under the Note $233,750. [*Id.*]. The Modification Agreement was signed by JeffEx (acting through Jeffrey Cioni) and each of the individual defendants. [*Id.*] 3. It is undisputed that neither JeffEx nor the individual defendants paid Solidarity any of the money due under the Note by May 15, 2016, nor is there any dispute that the balance remains outstanding as of the date Solidarity moved for summary judgment. [93-3] 3, at ¶¶ 15-16; [93-11] 9, at 23:6-24 (deposition of David Brittsan).

In February 2020, Solidarity sued JeffEx, the Cionis, and Brittsan for breach of contract based on their failure to repay Solidarity the amount due under the Note, as modified by the Modification Agreement. [1].[3] In count one of its second amended complaint, Solidarity alleged that defendants' failure to pay Solidarity $233,750 amounted to a breach of the Note as modified by the Modification Agreement. [33] 5.[4]

### Legal Standard

A party is entitled to summary judgment only if it demonstrates that "there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter

---

[3] The Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a)(2) because Solidarity is a foreign corporation organized under Hong Kong law with its principal place of business in Hong Kong, *see* [93-3] 2, at ¶ 2; the sole member of JeffEx, Jeffrey Cioni, is an Illinois citizen, *see* [93-12] 5, at 8:15-9:18; and the individual defendants are all Illinois citizens, *see* [34] 2, at ¶¶ 3-5.

[4] The second amended complaint raised two additional claims for breach of the Note and breach of the Modification Agreement. *See* [33] 5, at ¶¶ 31-34. Because these claims were pleaded in the alternative to count one, and because they are entirely duplicative of count one, the Court denies Solidarity's motion for summary judgment on these claims as moot.

of law." Fed. R. Civ. P. 56(a). A genuine dispute about a material fact exists "if the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016). In answering this question, the Court construes all facts and draws all reasonable inferences "in favor of the party against whom the motion under consideration was filed." *Richardson v. Chicago Transit Auth.*, 926 F.3d 881, 886 (7th Cir. 2019).

## Discussion

Solidarity argues that it is entitled to summary judgment on its claim for breach of commercial note because any reasonable jury would find that the defendants breached the Note, as modified by the Modification Agreement, by failing to pay Solidarity $233,750. [93-2] 2-5.

Defendants do not dispute that Solidarity is owed $233,750 or that none of this money was ever paid to Solidarity. *See* [96] 1, 3-8. Rather, defendants argue that the Note is ambiguous as to whether the Cionis and Brittsan agreed to personally guarantee the loan, and that extrinsic evidence would permit a reasonable jury to find that the Cionis and Brittsan did not personally guarantee the loan. [*Id.*] 3-8. Defendants also argue that a reasonable jury could find that Solidarity prevented defendants from performing their obligations under the Note, a finding that would relieve defendants of any liability for failing to repay Solidarity. [*Id.*] 8-11. Finally, defendants contend that the Note's interest provision is void under the Illinois Interest Act, 815 ILCS 205/4, *et seq.*, which generally limits the interest rate in written contracts to nine percent. [*Id.*] 11-13.

### I.     The Individual Defendants Are Personally Liable.

The Court concludes that the Note is unambiguous on the question of the individual defendants' liability on the Note: by signing the Note, the Cionis and Brittsan agreed to be jointly and severally liable with JeffEx for the debt to Solidarity.

#### A.     Illinois Law on Contract Interpretation

"To prevail on a claim for breach of contract under Illinois law, a plaintiff must establish the existence of a valid and enforceable contract, plaintiff's performance, defendant's breach of the terms of the contract, and damages resulting from the breach." *MCM Mgmt. Corp. v. Hudson Ins. Co.*, --- F. Supp. 3d ----, 2022 WL 17583756, at *5 (N.D. Ill. Dec. 12, 2022) (internal quotation marks omitted).

5

"The construction of a contract is a question of law" for the Court to resolve. *MCM Mgmt. Corp.*, 2022 WL 17583756, at *5. "A court's goal in a contract dispute is to determine and give effect to the parties' intent when they contracted." *Greggs, USA v. 400 East Prof'l Assocs., LP*, 198 N.E.3d 1062, 1068 (Ill. App. 2021). "A court must initially look to the language of a contract alone, as the language, given its plain and ordinary meaning, is the best indication of the parties' intent." *Gallagher v. Lenart*, 874 N.E.2d 43, 58 (Ill. 2007). "[B]ecause words derive their meaning from the context in which they are used, a contract must be construed as a whole, viewing each part in light of the others." *Id.* "[W]hen a contract's provisions are clear and unambiguous, a court must enforce them as written." *Chandra v. Chandra*, 53 N.E.3d 186, 193 (Ill. App. 2016).

A contract is ambiguous "only when the language has more than one reasonable interpretation." *Wood v. Evergreen Condo. Ass'n*, 189 N.E.3d 1045, 1051 (Ill. App. 2021). "A contract term is not ambiguous merely because it is undefined in the contract, nor does an ambiguity arise because the parties can suggest creative possibilities for its meaning." *Hunt v. Farmers Ins. Exch.*, 831 N.E.2d 1100, 1102 (Ill. App. 2005) (internal quotation marks omitted). "Whether a contract is ambiguous is a question of law for the trial court." *Sherwood Commons Townhome Owners Assoc., Inc. v. Dubois*, 148 N.E.3d 900, 912 (Ill. App. 2020). If the court "determines that a contract is ambiguous, its construction then becomes a question of fact," *Hunt*, 831 N.E.2d at 1102, and extrinsic evidence is admissible to resolve the ambiguity, *see Gomez v. Bovis Lend Lease, Inc.*, 22 N.E.3d 1, 4 (Ill. App. 2013).

### B. Because the Individual Defendants Signed the Note, They Are "The Undersigned" Who Agreed to Be Personally Liable on the Note.

The Note unambiguously provides that any person who signed the Note would be jointly and severally liable for the debt to Solidarity. Because the Cionis and Brittsan signed the Note, they are jointly and severally liable to Solidarity.

The Note opens with a promise by "[t]he Undersigned . . . *jointly and severally, if more than one*," to pay Solidarity $175,000 in principal and $50,000 in interest. [96-6] 2 (emphasis added). This promise is reiterated in the "Other Matters" section of the Note, where "[t]he Undersigned and each guarantor hereof, if any . . . *agree to be jointly and severally bound* hereby[.]" [*Id.*] 3 (emphasis added). The "Other Matters" section then states, for a second time, that "[t]he Undersigned, if more than one, *agree that they are jointly, severally, and primarily liable* for repayment of this Note[.]" [*Id.*] 4 (emphasis added). The Note then concludes with a statement that "[t]he Undersigned have caused this Note to be executed as of the date first written above. Signature Page follows." [*Id.*] 4. As already discussed, each of the individual defendants signed the signature page that immediately follows this language.

6

There is only one reasonable way to understand this language: because the Cionis and Brittsan signed the Note, they constitute "[t]he Undersigned" who repeatedly promised to be jointly and severally liable for repaying Solidarity. Although the Note does not define "[t]he Undersigned," that term has a plain, ordinary, and–especially in the context of a signed promissory note–obvious meaning: "[s]omeone whose name is signed on a document, esp. at the end[.]" Black's Law Dictionary (11th Ed. 2019); *see also Farmers' Exch. Bank of Elvaston v. Sellers*, 187 N.E. 289, 226-27 (Ill. 1933) ("In Webster's New International Dictionary (1927) the words 'the undersigned' are defined to mean: The person whose name is signed or the persons whose names are signed at the end of the document; the subscriber or subscribers.") (some internal quotation marks omitted). The Note could hardly be clearer that the identities of "[t]he Undersigned" were determined by those who had signed the signature page: the Note expressly states that "[t]he Undersigned *have caused this Note to be executed*" and refers to a "Signature Page" that immediately follows this language.

For these reasons, the Court holds that the contractual term "[t]he Undersigned" unambiguously refers to those whose names were signed at the end of the Note, including the Cionis and Brittsan.

Defendants attempt to manufacture ambiguity where none exists. They first observe that the Note does not define "[t]he Undersigned." [96] 4-5. But the fact that a contractual term is undefined does not make the term ambiguous. *See Hunt*, 831 N.E.2d at 1102. Instead, "an undefined term in a contract will be given its plain and ordinary meaning, which is found in its standard dictionary definition." *Laport v. MB Fin. Bank, N.A.*, 983 N.E.2d 1055, 1059 (Ill. App. 2012). Here, the ordinary meaning of "undersigned"–one whose name is signed at the end of a document–is consistent with how "[t]he Undersigned" is used throughout in the Note–and in particular with the language stating that "[t]he Undersigned have caused this Note to be executed" on the immediately following signature page.

Next, defendants argue that "[t]he Undersigned" can be interpreted to refer only to JeffEx, and not the individual defendants. [96] 5. In support, defendants observe that, in the Note's preamble, the term "Undersigned" appears in connection with the phrase "principal place of business": "The Undersigned (whose principal place of business is listed below), jointly and severally, if more than one . . . promise to pay" Solidarity the amount due under the Note. [96-6] 2. Defendants contend that the only business address identified on the signature page is JeffEx's business address, and that the addresses listed next to the individual defendants' names are not business addresses. [*Id.*].

The Court rejects this argument because construing the "[t]he Undersigned" to refer only to JeffEx is not a reasonable interpretation of that term, let alone a

7

reasonable construction of the Note as a whole. *See Wood*, 189 N.E.3d at 1051 (contract is ambiguous only if language has two or more reasonable interpretations).

Defendants' argument–which emphasizes the preamble of the Note but essentially ignores how "[t]he Undersigned" is used throughout the Note–is contrary to Illinois law, which instructs that "a contract must be construed as a whole, viewing each part in light of the others." *Gallagher*, 874 N.E.2d at 58; *see also Mill Creek Water Reclamation Dist. v. Shodeen as Trustee of Kent W. Shodeen Trust No. 1*, --- N.E.3d ----, 2022 IL App (2d) 200599, ¶ 39 ("Courts must consider the contract as a whole and not focus on isolated portions."). According to defendants, because the preamble of the Note states that the "principal place of business" of "[t]he Undersigned" is "listed below," the term "Undersigned" must refer only to JeffEx because only JeffEx's business address is listed on the signature page. [96] 4-5. But this interpretation of "[t]he Undersigned" creates an internal inconsistency in the Note, which repeatedly contemplates that there may be more than a single "Undersigned." There are at least four provisions of the Note that refer to the possibility of there being more than one "Undersigned"–including the preamble on which defendants' argument depends.[5] Had the parties intended JeffEx to be the only "Undersigned"–and thus the only party that was liable on the Note to Solidarity–there is no reason why the Note would repeatedly allow for the possibility of there being more than a single "Undersigned." *Cf. Market Street Bancshares v. Fed. Ins. Co.*, 962 F.3d 947, 955 (7th Cir. 2020) ("Illinois law commands that . . . meaning and effect must be given to every part of the contract including all its terms and provisions, so no part is rendered meaningless or surplusage unless absolutely necessary.") (internal quotations marks and citation omitted). This inconsistency, which is eliminated if "[t]he Undersigned" is given its plain and ordinary meaning as those persons who have signed their names at the end of a document, further convinces the Court that the meaning of "[t]he Undersigned" depends on who signed the Note. Given the plain and ordinary meaning of the term "undersigned," and the undisputed fact that not only Jeffex, but also the individual defendants signed the Note's signature page, it is simply unreasonable to conclude that "[t]he Undersigned" refers only to JeffEx.

Finally, defendants argue that "the Note contains no language referring to" the individual defendants as "Obligors," and the Note does not "associate[e] the term 'Obligors' with the term under which the [individual defendants'] names appear as

---

[5] *See* [96-2] 2 ("The Undersigned (whose principal place of business is listed below), jointly and severally, *if more than one* . . . promise to pay") (emphasis added); [*id.*] 3 ("Lender's remedies under this Note . . . shall be cumulative and concurrent and may be pursued *singly, successively, or together against any or all of the Undersigned*") (emphasis added); [*id.*] 4 ("*Each of the Undersigned, if more than one*, hereby waives and relinquishes any and all right . . . to recover from any other of the Undersigned any amounts paid to Lender") (emphasis added); [*id.*] ("*The Undersigned, if more than one*, agree that they are jointly, severally, and primarily liable for repayment") (emphasis added).

signatories, namely 'Individuals.'" [96] 5. This argument, which asks the Court to consider the significance of language that the parties did not include in their contract rather than interpreting the language in the Note, is a nonstarter. First, the Note defines "Obligors" as "[t]he Undersigned and each guarantor hereof, if any, and any and all others who now or may become liable for all or part of the obligations of the Undersigned under this Note[.]" [96-6] 3. The Note is therefore clear that, if the individual defendants signed the Note (and are thus included among "[t]he Undersigned"), they are also considered to be "Obligors." Second, whether the Note defines "Obligors" as "Individuals" is irrelevant given the plain meaning of "[t]he Undersigned" and the structure of the Note, which clearly establishes that the parties who signed the Note are jointly and severally liable for the sum owed to Solidarity.

For these reasons, the Court holds that the Note is unambiguous, the Cionis and Brittsan are "[t]he Undersigned" because they signed the Note's signature page, and the individual defendants are therefore jointly and severally liable for the sum owed under the Note as modified by the Modification Agreement.

## II. No Jury Could Find That Solidarity Prevented Defendants from Performing Their Obligations under the Note.

"In contract law, the general principle known as the doctrine of prevention provides that, 'if one party to a contract hinders, prevents, or makes impossible performance by the other party, the latter's failure to perform will be excused.'" *Tabatabai v. West Coast Life Ins. Co.*, 664 F.3d 663, 666 (7th Cir. 2011) (quoting Williston on Contracts § 39:3 (4th ed. 2000). Illinois law recognizes the prevention of performance doctrine, which provides a defense to a breach-of-contract claim. *See, e.g.*, *Barrows v. Maco, Inc.*, 419 N.E.2d 634, 639 (Ill. App. 1981) ("A party to a contract may not complain of the nonperformance of the other party where that performance is prevented by his own actions."); *Fife v. mPhase Techs., Inc.*, Case No. 12-cv-9647, 2014 WL 7146212, at *13 (N.D. Ill. Dec. 15, 2014) ("Under Illinois contract law, when a party prevents performance of a contract, that party cannot recover for non-performance by the other party.") (internal quotation marks omitted).

Defendants argue that summary judgment should be denied because a reasonable jury could find that Solidarity prevented them from repaying the sum owed under the Note.

According to defendants, in mid-December 2016 Solidarity filed a Uniform Commercial Code financing statement with the Illinois Secretary of State's Office that asserted a lien on JeffEx's equipment. [96-2] 9, at ¶ 25. Although the security agreement between Solidarity and JeffEx authorized Solidarity to file such a financing statement, *see* [93-7] 3, the individual defendants were not parties to that agreement, [*id.*] 2, 7. Nevertheless, and in apparent contravention of the security agreement, the financing statement identified not only JeffEx as a debtor, but also

9

the Cionis and Brittsan. *See* [93-13] 2-4 (UCC financing statement dated Dec. 14, 2016). Defendants contend that Solidarity's filing of the financing statement interfered with their efforts to sell JeffEx's tractors and loaders at the highest possible price and use the sale proceeds to repay Solidarity. [96] 9-11. As they explain, the individual defendants were then in negotiations with Centrust Bank, which had loaned RTR $200,000 and held a senior security interest in JeffEx's equipment. [96-2] 8, at ¶ 22. Centrust had intended to sell the equipment at a bank sale, but James Cioni apparently persuaded the bank to sell the equipment at a private sale in the spring of 2017, when the Illinois construction season would begin and a higher sale price could be expected. [*Id.*] 8-9, at ¶¶ 23-24. However, after Centrust learned that Solidarity had filed the financing statement–and after Solidarity refused to "'unrecord' the UCC lien"–Centrust proceeded with the bank auction, at which the equipment was sold for only $213,500.00. [*Id.*] 10, at ¶¶ 28-29.

Even accepting this evidence as true, it cannot support a rational jury finding that Solidarity prevented the defendants' performance because the defendants had already breached the Note before Solidarity filed the financing statement. According to the Modification Agreement, the Note matured–and payment became due–on May 15, 2016. [93-8] 2. It is undisputed that none of the defendants repaid the loan by that date (or at any point thereafter), and defendants were in default after May 25, 2016. *See* [96-6] 2 (defining "Default" as failure to pay any sum due under the Note "for a period in excess of ten days after it becomes due and payable"). Because defendants breached the Note before Solidarity filed the financing statement, it is not logically possible to say that the filing of the financing statement prevented defendants from repaying Solidarity. On the contrary, the doctrine of prevention of performance is simply inapplicable in this case:

> The rule that nonperformance by one party to a contract is excused if the other party hinders or prevents the performance or makes it impossible applies *only if the failure to perform was not caused by the prevented party's own inability to perform*. In other words, absent the prevention, the prevented party must otherwise have been able to perform.

Williston on Contracts § 39:8 (emphasis added).

Here, the defendants were clearly and indisputably unable to perform, as evidenced by their failure to repay the loan at any point between the Note's maturity date in May 2016 and the filing of the financing statement seven months later. For that reason, defendants' affirmative defense does not preclude entry of judgment as a matter of law for Solidarity.

10

### III. The Note's Interest Provision Is Valid.

Defendants argue that a genuine factual dispute exists as to whether Solidarity may collect the $50,000 interest payment due under the Note. [96] 11-13. Defendants invoke the Illinois Interest Act, 815 ILCS 205/4, *et seq.*, which provides that "parties to a written contract are generally limited to a 9% maximum interest rate." *McGinley Partners, LLC v. Royalty Props., LLC*, 117 N.E.2d 1207, 1225 (Ill. App. 2018). Defendants acknowledge that "[i]t is lawful to charge, contract for, and receive any rate or amount of interest or compensation . . . with respect to . . "[a]ny loan made to a corporation" and "any business loan to a business association." 815 ILCS 205/4(1)(a), (c). But defendants contend that these exceptions are inapplicable because the loan was not made solely to a corporation or business association, but to a business (JeffEx) and three individuals who "are separate and distinct from the business organization of JeffEx." [96] 12. Thus, defendants argue that the $50,000 interest provision, which represents a roughly 28.5% interest rate, is unenforceable.

Solidarity offers two arguments in response. First, Solidarity argues that the nine-percent cap does not apply because the loan to the defendants was a loan to a "corporation." [100] 10-11. Relying on *Northwest Fed. Savings & Loan Assocs. v. Weisberg*, 422 N.E.2d 1101 (Ill. App. 1981), Solidarity appears to contend that the Court can disregard the individual defendants' roles in executing the Note because the Cionis and Brittsan acted merely as guarantors for JeffEx who cannot, under the rule of the *Weisberg* case, raise a usury defense based on the Interest Act. [*Id.*] 10. Second, Solidarity contends that JeffEx and the individual defendants together constituted a "business association," such that the loan qualifies for the exception in 815 ILCS 205/4(1)(c). [*Id.*] 11.

Given the undisputed evidence in the record, the Court finds that any reasonable jury would conclude that the loan from Solidarity was a "business loan" and that JeffEx and the individual defendants together constituted a "business association." For that reason, the loan qualifies as "any business loan to a business association" that is exempt from the Interest Act, and Solidarity is entitled to recover the $50,000 interest payment that is due under the Note.

First, there is no dispute that the $175,000 loan to the defendants was a "business loan." The Interest Act defines "business" as "a commercial, agricultural or industrial enterprise which is carried on for the purpose of investment or profit." 815 ILCS 205/4(1)(c). The Court therefore understands a "business loan" to be a loan for or relating to a commercial or industrial enterprise carried on for investment or profit. Defendants themselves characterized the loan as a bridge loan that was intended to provide RTR, a commercial partnership operated by the individual defendants, with short-term operating funds pending the resolution of RTR's funding issues with Venture DNA. [96-2] 3-4, at ¶¶ 7-8; *see also* [96-1] 2, at ¶ 9 (defendants' admission that "[t]he purpose of the Solidarity-JeffEx loan was to provide funding for Rescue

11

Tire Recycling"). RTR intended to use the loan to purchase real estate, a building/headquarters, and equipment that would be used in its business operations, which involved the recovery of rubber mesh and steel from used tires and the sale of both articles in refurbished form. [*Id.*] 2-3, at ¶¶ 4-5. This evidence essentially compels the conclusion that the loan was for a commercial enterprise being carried out for profit.

Second, any reasonable jury would also conclude that JeffEx and the individual defendants together constituted a "business association" for purposes of 815 ILCS 205/4(1)(c).

The Interest Act does not define "business association," and the parties have not cited any relevant Illinois cases in which this term was construed or this provision of the Interest Act applied. As a federal court sitting in diversity and applying Illinois law, the Court's task is to "predict how the Illinois Supreme Court would decide the issues presented here[.]" *Nationwide Agribusiness Ins. Co. v. Dugan*, 810 F.3d 446, 450 (7th Cir. 2015). Under Illinois law, courts will "apply the rules of statutory interpretation" to determine the meaning of an undefined statutory term. *State ex rel. Leibowitz v. Family Vision Care, LLC*, 181 N.E.3d 790, 797 (Ill. 2020). "The fundamental rule of statutory interpretation is to ascertan and give effect to the legislature's intent, and the best indicator of that intent is the statutory language, given its plain and ordinary meaning." *Id.* "A court must view the statute as a whole, construing words and phrases in light of other relevant statutory provisions and not in isolation." *Id.* "When the statute contains undefined terms, it is entirely appropriate to employ a dictionary to ascertain the plain and ordinary meaning of those terms." *People v. McChriston*, 4 N.E.3d 29, 33 (Ill. 2014) (internal quotation marks omitted). "Where the language is clear and unambiguous, [the court] will apply the statute without resort to further aids of statutory construction." *Id.* (internal quotation marks omitted).

Although the Interest Act does not define "business association," it does, as noted above, define "business" as a "commercial, agricultural or industrial enterprise which is carried on for the purpose of investment or profit[.]" 815 ILCS 205/4(1)(c). The Court therefore looks to dictionary definitions to determine the plain and ordinary meaning of the term "association." As relevant here, Black's Law Dictionary defines "association" as "[a] gathering of people for a common purpose; the persons so joined" and "[a]n unincorporated organization that is not a legal entity separate from the persons who compose it." Black's Law Dictionary (11th ed. 2019). Merriam-Webster's defines "association" as "an organization of persons having a common interest." Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/association (last visited Mar. 27, 2023).

Based on these definitions, the Court concludes that, for purposes of § 205/4(1)(c), a "business association" is a gathering or organization of people to carry

out a commercial, agricultural, or industrial enterprise for the purpose of investment or profit. As just discussed, the undisputed evidence establishes that JeffEx, the Cionis, and Brittsan had organized themselves for the purpose of obtaining a business loan from Solidarity so that the individual defendants could fund RTR's short-term business operations. In these circumstances, the fact that "[t]he Individually Named Defendants are separate and distinct from the business organization of JeffEx," [96] 12, is irrelevant. The definition of "business association" does not require the existence of a formal business structure, a separate corporate identity, or the like: it requires only an organizing or gathering of people for the purpose of carrying out a for-profit enterprise. This conclusion is reinforced by the existence of § 205/4(1)(a), which exempts "[a]ny loan made to a corporation[.]" The Illinois courts have applied that section in cases involving loans to a limited liability company, which, like a corporation, has a legal identity that is separate from that of its members. *See Asset Exch. II, LLC v. First Choice Bank*, 953 N.E.2d 446, 452 (Ill. App. 2011) ("There is no dispute here that [LLC] plaintiff is a corporation within the meaning of the Illinois Interest Act, and thus the Act does not apply to plaintiff's loan agreement with the Bank."); *see also McGinley Partners*, 117 N.E.3d at 1211-12, 1226 (holding that "Interest Act would remain inapplicable" to loan to Royalty Properties, LLC "because the loan was made to a corporation"). Section 205/4(1)(c), in contrast, reaches multiple categories of business borrowers, such as partnerships and sole proprietorships, which, like a "business association," do not have separate legal identities. Finally, the Court concludes that its holding is consistent with *People v. Gallo*, where the Illinois Supreme Court characterized these exceptions to the Interest Act as distinguishing between "loans to those who are engaged in business"–and presumptively more competent to decide whether and when to agree to pay a higher interest rate"–"and loans to those who are not." 297 N.E.2d 569, 573 (1973). The proper interpretation of "business association" is the one adopted by the Court, which focuses on the gathering or organizing for business purposes, and not on the presence or absence of a legally distinct corporate identity.

Because any reasonable jury would find that the loan from Solidarity to JeffEx and the individual defendants was a "business loan to a business association," the loan is not subject to the nine-percent cap on interest rates in written contracts.[6]

In sum, it is undisputed that (1) a valid contract existed between Solidarity, JeffEx, the Cionis, and Brittsan; (2) Solidarity performed its obligations by disbursing the $175,00 loan to JeffEx; (3) the defendants breached the contract by failing to pay Solidarity the $233,500 that was due under the Note, as modified by the Modification Agreement; and (4) Solidarity has incurred damages in the amount of $233,500. Solidarity is therefore entitled to summary judgment on count one of its second amended complaint.

---

[6] In light of this conclusion, the Court need not address Solidarity's argument that the loan is also exempt from the Interest Act because it was a loan to a corporation.

### IV. Solidarity Is Entitled to Prejudgment Interest.

Solidarity argues that it is entitled to recover prejudgment interest from May 15, 2016, when the Note became due under the Modification Agreement, and the date of judgment. [93-2] 4. Defendants do not address this argument in their opposition brief.

"Under Illinois law, the general rule is that prejudgment interest cannot be awarded unless by statute or agreement of the parties." *Sterling Nat'l Bank v. Block*, No. 16 C 9009, 2019 WL 5085715, at *3 (N.D. Ill. Oct. 10, 2019). To be entitled to prejudgment interest, the amount due must be "a fixed amount or easily computed." *Bank of Chicago v. Park Nat'l Bank*, 640 N.E.2d 1288, 1296 (Ill. App. 1994).

Because there is no agreement in this case respecting prejudgment interest, the Court looks to the Illinois Interest Act, which provides that:

> Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing; on money lent or advanced for the use of another; on money due on the settlement of account from the day of liquidating accounts between the parties and ascertaining the balance; on money received to the use of another and retained without the owner's knowledge; and on money withheld by an unreasonable and vexatious delay of payment.

815 ILCS 205/2.

Here, the Note is both a "promissory note" and "an instrument of writing."

Illinois law defines a promissory note as "an unconditional promise to pay a fixed amount of money and is payable to bearer or to order at the time it is issued or first comes into possession of a holder." *Deutsche Bank Nat'l Trust Co. v. Estate of Schoenberg*, 105 N.E.3d 80, 89 (Ill. App. 2018). The Note contains an unconditional promise to pay the sum of $175,000 in principal, $50,000 in interest, and $8,750 in late charges. *See* [96-6] 2; [93-8] 2. The Note was also payable "to the order of Solidarity Limited" when it was issued. [96-6] 2. For these reasons, the Note qualifies as a "promissory note."

"The 'instrument of writing' provision of the Interest Act incorporates two requirements into a claim for interest based upon a written instrument. First, the written instrument must establish a debtor/creditor relationship. Second, the written instrument must contain a specific due date." *Adams v. Am. Int'l Grp., Inc.*, 791 N.E.2d 26, 30 (Ill. App. 2003) (internal quotation marks and citations omitted). Here, the Note creates an obligation to pay Solidarity a sum certain, and the Note, as

14

modified by the Modification Agreement, contains a specific due date. The Note is thus "an instrument of writing."

Finally, Solidarity is owed a "fixed amount"–$233,750–under the Note, as modified by the Modification Agreement.

Accordingly, from May 15, 2016 through May 15, 2022, Solidarity is entitled to $70,125 in prejudgment interest ($233,750 x .05 = $11,687.50 x 6 years = $70,125). From May 15, 2022 until March 29, 2023, Solidarity is entitled to $10,182.36 in prejudgment interest (annual interest of $11,687 / 365 days = $32.02 per day x 318 days = $10,182.36). In total, Solidarity is entitled to $80,307.36 in prejudgment interest.

## V. Solidarity Is Entitled to Reasonable Attorney Fees and Expenses.

Finally, Solidarity argues that it is entitled to recover the attorney fees and costs it incurred in bringing this action. [93-2] 4-5. It relies on language in the Note providing that, "[i]f any attorney is engaged by Lender . . (a) to collect the indebtedness evidenced hereby or due under the Loan Documents, whether or not legal proceedings are thereafter instituted . . . then the Undersigned shall pay to Lender all reasonable attorneys' fees and expenses incurred or determined to be due in connection therewith, in addition to all other amounts due hereunder." [96-2] 3. Solidarity requests leave to file a fee petition under Fed. R. Civ. P. 54(d) or, in the alternative, for entry of judgment awarding it $33,326.60 in fees and $6,675.25 in expenses. [93-2] 5. Defendants do not dispute that the Note entitles Solidarity to recover its reasonable fees and costs, but they object that Solidarity has not "included any citation to the discovery record" to substantiate the amount of fees and costs incurred. [96-1] 9, at ¶ 29.

The Court concludes that Solidarity is entitled to recover the reasonable attorney fees and expenses it incurred to collect the amount due under the Note, as modified by the Modification Agreement. The Note clearly states that "[t]he Undersigned"–which the Court has already held refers to JeffEx and the individual defendants–must pay Solidarity "all reasonable attorneys' fees and expenses" incurred by Solidarity "to collect the indebtedness evidenced hereby or due under the Loan Documents[.]" [96-2] 3. Because there is an amount due under the Note, and because Solidarity has incurred legal fees to collect that sum, the fee-shifting provision of the Note applies and entitles Solidarity to recover its reasonable fees and expenses. However, the record is insufficient to determine the amount of fees to which Solidarity is entitled. Because the Note contains a fee-shifting provision, the Court's role in determining the amount of fees to be awarded is limited: the Court asks only whether the fees were "commercially reasonable." *Matthews v. Wisc. Energy Corp., Inc.*, 642 F.3d 565, 572 (7th Cir. 2011); *see also Medcom Holding Co. v. Baxter Travenol Labs, Inc.*, 200 F.3d 518, 521 (7th Cir. 1999) ("Instead of doing a detailed,

15

hour-by-hour review after the fashion of a fee-shifting statute, [the court] should have undertaken an overview of [the prevailing party's] aggregate costs to ensure that they were reasonable in relation to the stakes of the case and [its opponent's] litigation strategy."). Still, the Court lacks the information needed to determine whether the amount Solidarity seeks is commercially reasonable, such as whether Solidarity paid the fees at the billed rate. *See Kallman v. Radioshack Corp.*, 315 F.3d 731, 742 (7th Cir. 2002) (if a party "incurred the expense for her counsel's services and paid their bill," such payment is "strong evidence of commercial reasonableness").

Accordingly, the Court grants Solidarity's request for leave to file a fee petition under Rule 54. Solidarity's fee petition is due on or before June 27, 2023 (90 days after entry of judgment). The parties must comply with Local Rule 54.3, which governs the filing of fee petitions in the Northern District of Illinois. *See Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp. 3d 1000, 1012-12 (N.D. Ill. 2016) (describing requirements of L.R. 54.3 and their importance to resolution of fee disputes).

## Conclusion

For the reasons set forth above, Solidarity Limited's motion for summary judgment [93] is granted as to count one of the second amended complaint and denied as moot as to counts two and three of the second amended complaint. Solidarity is entitled to recover $175,000 in principal, $50,000 in interest, $8,750 in late charges, and $80,307.36 in prejudgment interest, for a total of $314,057.36, from defendants JeffEx, LLC, Jeffrey Cioni, James Cioni, and David Brittsan, all of whom are jointly and severally liable. Solidarity is also entitled to recover its reasonable attorney fees and expenses, in an amount to be determined at a later date. Solidarity's fee petition is due on or before June 27, 2023 (90 days after entry of judgment), and the parties must comply with Local Rule 54.3 in resolving Solidarity's fee request.

*Heather K. McShain*

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: March 29, 2023**